UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

CHRISTOPHER BURGESS,

        Petitioner,

v.                                    Case No.  3:12cv498/MCR/CJK

MICHAEL D. CREWS,

        Respondent.

_____/

## REPORT AND RECOMMENDATION

        Before the court is an amended petition for writ of habeas corpus filed under 28 U.S.C. § 2254.  (Doc. 5).  Respondent filed an answer, submitting relevant portions of the state court record.  (Doc. 23).  Petitioner has not replied, although invited to do so.  (*See* Doc. 25).  The matter is referred to the undersigned magistrate judge for report and recommendation pursuant to 28 U.S.C. § 636 and N.D. Fla. Loc. R. 72.2(B).  After careful consideration of all issues raised by petitioner, the undersigned concludes that no evidentiary hearing is required for the disposition of this matter.  Rule 8(a) of the Rules Governing Section 2254 Cases in the United States District Courts.  The undersigned further concludes that the pleadings and attachments before the court show that petitioner is not entitled to federal habeas relief, and that the amended petition should be denied.

BACKGROUND AND PROCEDURAL HISTORY

On October 27, 2004, petitioner was charged by amended information filed in Walton County Circuit Court Case Number 04-CF-664, with (1) Trafficking in Methamphetamine (200 grams or more) between November 1, 2002 and August 28, 2003, (2) Unlawful Possession of Listed Chemical (Acetone) on August 28, 2003, and (3) Possession of Drug Paraphernalia on August 28, 2003.[1]  (Doc. 23, Ex. A, pp. 42-43).[2]  Petitioner went to trial (Ex. B), and on April 15, 2005, a jury found him guilty of all counts as charged.  (Ex. A, pp. 167-68).  By judgment rendered May 24, 2005, petitioner was adjudicated guilty and sentenced to a total of twenty years in prison with a fifteen-year mandatory minimum.  (Ex. A, pp. 191-98; Ex. C).  Petitioner's judgment of conviction was affirmed on direct appeal, per curiam and without a written opinion, on June 23, 2006.  *Burgess v. State*, 932 So. 2d 195 (Fla. 1st DCA 2006) (Table) (copy at Ex. G).

On December 5, 2006, petitioner filed a counseled motion for postconviction relief under Florida Rule of Criminal Procedure 3.850.  (Ex. H, pp. 1-9).  The circuit court held an evidentiary hearing and denied relief in an order rendered May 20, 2011.  (*Id*., pp. 278-407).  The Florida First District Court of Appeal ("First DCA") per curiam affirmed on March 13, 2012, without a written opinion.  *Burgess v. State*,

---

[1]The alleged drug paraphernalia was "[P]yrex glassware and/or funnels and/or Red Devil lye and/or gloves and/or razor blades and/or scales and/or burnt foil and/or busted blister packs and/or smoking devices and/or starter fluid and/or hot plate and/or one or more microwave oven(s) and/or phosphorous and/or recipes and/or plastic tubing and/or baggies and/or other paraphernalia."  (Doc. 23, Ex. A, p. 42).

[2]All references to exhibits are to those provided at Doc. 23, unless otherwise noted.  If a cited page has more than one page number, the court cites to the "Bates stamp" page number.

83 So. 3d 712 (Fla. 1st DCA 2012) (Table) (copy at Ex. J). The mandate issued March 29, 2012. (Ex. J).

Petitioner initiated this federal habeas proceeding on October 16, 2012. (Doc. 1). Petitioner's counseled amended petition, filed on October 30, 2012, raises one ground for relief: (1) "The Trial Court Wrongly Denied The Defendant's Rule 3.850 Motion When The Defendant Alleged That His Attorney Failed To Subpoena A Material Witness To Testify." (Doc. 5, pp. 4-8). Respondent filed an answer, asserting that to the extent petitioner faults trial counsel for failing to call Agent Hatton as a witness, petitioner's claim is without merit because the state court's rejection of this claim was neither contrary to, nor involved an unreasonable application of *Strickland*, and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. Respondent asserts that to the extent petitioner faults trial counsel for telling the jury in opening statement that Hatton would offer testimony exonerating petitioner, the claim is unexhausted and without merit. (Doc. 23, pp. 15-26).

APPLICABLE LEGAL STANDARDS

Section 2254 Standard of Review

Federal courts may issue habeas corpus relief for persons in state custody pursuant to 28 U.S.C. § 2254, as amended by the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA). Pub. L. 104-132, § 104, 110 Stat. 1214, 1218-19. Section 2254(d) provides, in relevant part:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–

>   (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

>   (2)   resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (2011).

The United States Supreme Court explained the framework for § 2254 review in *Williams v. Taylor*, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).[3] The appropriate test was described by Justice O'Connor as follows:

>   Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Id.*, 529 U.S. at 412-13 (O'Connor, J., concurring).

Employing the *Williams* framework, on any issue raised in a federal habeas petition upon which there has been an adjudication on the merits in a state court proceeding, the federal court must first ascertain the "clearly established Federal law," namely, "the governing legal principle or principles set forth by the Supreme

---

[3]Unless otherwise noted, references to *Williams* are to the majority holding, written by Justice Stevens for the Court (joined by Justices O'Connor, Kennedy, Souter, Ginsburg, and Breyer) in parts I, III, and IV of the opinion (529 U.S. at 367-75, 390-99); and Justice O'Connor for the Court (joined by Justices Rehnquist, Kennedy, Thomas, and – except as to the footnote – Scalia) in part II (529 U.S. at 403-13).  The opinion of Justice Stevens in Part II was joined by Justices Souter, Ginsburg, and Breyer.

Court at the time the state court render[ed] its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003). The law is "clearly established" only when a Supreme Court holding at the time of the state court decision embodies the legal principle at issue. *Thaler v. Haynes*, 559 U.S. 43, 47, 130 S. Ct. 1171, 175 L. Ed. 2d 1003 (2010); *Bowles v. Sec'y for Dep't of Corr.*, 608 F.3d 1313, 1315 (11th Cir. 2010).

After identifying the governing legal principle(s), the federal court determines whether the state court adjudication is contrary to the clearly established Supreme Court case law. The adjudication is not contrary to Supreme Court precedent merely because it fails to cite to that precedent. Rather, the adjudication is "contrary" only if either the reasoning or the result contradicts the relevant Supreme Court cases. *Early v. Packer*, 537 U.S. 3, 8, 123 S. Ct. 362, 154 L. Ed. 2d 263 (2002) ("Avoiding th[e] pitfalls [of § 2254(d)(1)] does not require citation to our cases – indeed, it does not even require *awareness* of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them."). If the state court decision is contrary to clearly established federal law, the federal habeas court must independently consider the merits of the petitioner's claim. *See Panetti v. Quarterman*, 551 U.S. 930, 954, 127 S. Ct. 2842, 168 L. Ed. 2d 662 (2007).

If the state court decision is not contrary to clearly established federal law, the federal habeas court next determines whether the state court "unreasonably applied" the governing legal principles set forth in the Supreme Court's cases. The federal court defers to the state court's reasoning unless the state court's application of the legal principle(s) was "objectively unreasonable" in light of the record before the state court. *Williams*, 529 U.S. at 409; *see Holland v. Jackson*, 542 U.S. 649, 652,

124 S. Ct. 2736, 159 L. Ed. 2d 683 (2004) (per curiam); *cf. Bell v. Cone*, 535 U.S. 685, 697 n. 4, 122 S. Ct. 1843, 152 L. Ed. 2d 914 (2002) (declining to consider evidence not presented to state court in determining whether its decision was contrary to federal law). An objectively unreasonable application of federal law occurs when the state court "identifies the correct legal rule from Supreme Court case law but unreasonably applies that rule to the facts of the petitioner's case" or "unreasonably extends, or unreasonably declines to extend, a legal principle from Supreme Court case law to a new context." *Putman v. Head*, 268 F.3d 1223, 1241 (11th Cir. 2001). A state court, however, may "decline to apply a specific legal rule that has not been squarely established by [the Supreme Court]" without running afoul of the "unreasonable application" clause. *Knowles v. Mirzayance*, 556 U.S. 111, 122, 129 S. Ct. 1411, 173 L. Ed. 2d 251 (2009).

When faced with a state appellate court's summary affirmance of a trial court's decision, the "unreasonable application" standard focuses on the state court's ultimate conclusion, not the reasoning that led to it. *See Gill v. Mecusker*, 633 F.3d 1272, 1287 (11th Cir. 2011) (*citing Harrington v. Richter*, — U.S. —, 131 S. Ct. 770, 786, 178 L. Ed. 2d 624 (2011)). The federal court must determine what arguments or theories supported or could have supported the state court's decision, and then ask whether it is possible that fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior Supreme Court decision. *See Richter*, 131 S. Ct. at 786; *see also Gill*, 633 F.3d at 1292 (holding that the federal district court may rely on grounds other than those articulated by the state court in determining that habeas relief was not warranted, so long as the district court did not err in concluding that the state court's rejection of the petitioner's claims was neither

an unreasonable application of a Supreme Court holding nor an unreasonable determination of the facts).  In sum, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 131 S. Ct. at 786-87.

Section 2254(d) also allows federal habeas relief for a claim adjudicated on the merits in state court where that adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).  As with the "unreasonable application" clause, the federal court applies an objective test.  *Miller-El v. Cockrell*, 537 U.S. 322, 340, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003) (holding that a state court decision based on a factual determination "will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceeding.").  The "unreasonable determination of the facts" standard is implicated only to the extent the validity of the state court's ultimate conclusion is premised on unreasonable fact finding.  *See Gill*, 633 F.3d at 1292.

When performing review under § 2254(d), the federal court presumes that all factual determinations made by the state court are correct.  28 U.S.C. § 2254(e)(1).  The petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence."  *Id.*; *see, e.g., Miller-El*, 537 U.S. at 340 (explaining that a federal court can disagree with a state court's factual finding and, when guided by AEDPA, "conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence").  Neither the Supreme Court nor the

Eleventh Circuit has interpreted how § 2254(d)(2) and §2254(e)(1) interact in the context of fact-based challenges to state court adjudications. *Cave v. Sec'y for Dep't of Corr.*, 638 F.3d. 739 (11th Cir. 2011).  However, the Eleventh Circuit recently declined to grant habeas relief under § 2254(d)(2) in the context of a state appellate court's summary affirmance, where it found that the validity of the state court decision was not premised on the trial court's unreasonable fact finding, and that the petitioner failed to demonstrate "by clear and convincing evidence that the record reflect[ed] an insufficient factual basis for affirming the state court's decision." *Gill*, 633 F.3d at 1292.

Only if the federal habeas court finds that the petitioner satisfied AEDPA and § 2254(d), does the court take the final step of conducting an independent review of the merits of the petitioner's claims.  *See Panetti*, 551 U.S. at 954.  Even then, the writ will not issue unless the petitioner shows that he is in custody "in violation of the Constitution or laws and treaties of the United States." 28 U.S.C. § 2254(a).  "If this standard is difficult to meet, that is because it was meant to be."  *Richter*, 131 S. Ct. at 786.

<u>Standard Governing Claims of Ineffective Assistance of Trial Counsel</u>

In *Strickland v. Washington*, 466 U.S. 688, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the Supreme Court set out a two-part inquiry for ineffective assistance claims. The petitioner must show that (1) his counsel's performance was constitutionally deficient, and (2) the deficient performance prejudiced the petitioner.  *Id.*, 466 U.S. at 687.  "First, petitioner must show that 'counsel's representation fell below an objective standard of reasonableness.  Second, petitioner must show that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the

proceeding would have been different.'" *Darden v. Wainwright*, 477 U.S. 168, 184, 106 S. Ct. 2464, 91 L. Ed. 2d 144 (1986) (*quoting Strickland*, 466 U.S. at 668, 694).

Trial "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland* at 690, 104 S. Ct. at 2066. "To overcome that presumption, a defendant must show that counsel failed to act reasonably considering all the circumstances." *Cullen v. Pinholster*, — U.S. —, 131 S. Ct. 1388, 1403, 179 L. Ed. 2d 557 (2011) (quotation marks and alterations omitted). "[T]he absence of evidence cannot overcome the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance." *Burt v. Titlow*, — U.S. —, 134 S. Ct. 10, 17, 187 L. Ed. 2d 348 (2013) (quotation marks and alterations omitted).

With regard to prejudice, the *Strickland* court emphasized that a defendant must show a "reasonable probability" of a different result. A reasonable probability is one that sufficiently undermines confidence in the outcome. *Id.* at 694, 104 S. Ct. at 2068. "The likelihood of a different result must be substantial, not just conceivable." *Richter*, 131 S. Ct. at 792.

## DISCUSSION

Petitioner claims trial counsel was ineffective when he failed to subpoena and call FDLE Agent Barry Hatton to testify at trial, after telling the jury in opening statement that they would hear testimony from Hatton that Jesse Lusk, the husband of the State's key witness Susan Lusk, told Hatton that the meth oil found on the Lusk's property belonged to Susan. Petitioner raised both aspects of this claim (counsel's failure to call Hatton and counsel's promising Hatton's testimony in opening statement) in his state postconviction motion. There, petitioner faulted

counsel for failing to secure the testimony of Officer Hatton, and argued petitioner was prejudiced because Hatton's testimony "would have created reasonable doubt as to the testimony of the State's key witness and would have helped establish that the [sic] Mrs. Lusk was responsible for the drugs and paraphernalia found on their property." (Ex. H, p. 16).  Petitioner argued further that without Hatton's testimony, he "was unable to adequately demonstrate Mrs. Lusk's motivation to give false testimony regarding [petitioner's] involvement in the charged offenses."  (*Id*.). Petitioner argued that counsel's error "was exacerbated by counsel's opening statement, when he told the jury to expect such testimony." (*Id*. pp. 16-17; *see also* Ex. H, pp. 258-67 (petitioner's post-evidentiary hearing written closing argument)). Defense counsel's opening statement at trial provided, in relevant part, as follows:

> You will get to see the photos taken of Susan's home and in her shed.  You will get to see the photos and you will get to see Susan's, Susan's methamphetamine oil.  And I am not the only one to call it Susan's methamphetamine oil, because you will hear testimony from the Florida Department of Law Enforcement, F.D.L.E. Special Agent Hatton.  Hatton interviewed Susan's husband, Jesse.
>
> MS. SIMS [prosecutor]:  I'm going to object at this point, Your Honor, to hearsay in his opening; that would be hearsay.
>
> BY MR. WEINSTOCK [defense counsel]:  Continuing
>
> Evidence will show –
>
> THE COURT:  There you go; evidence will show.
>
> BY MR. WEINSTOCK:  Continuing
>
> Evidence will show that when Special Agent Hatton spoke to Jesse, Jesse told him that the meth oil was Susan's; Susan's and no one

else's.  Husband Jesse did not say, "It belongs to me and my wife;" Jesse
did not say he knew nothing about the meth oil; he did not say the meth
oil was planted by an unknown stranger.  No.  Susan's own husband told
Special Agent Hatton that the meth oil belonged to his wife, Susan.

(Ex. B, pp. 29-30).

The state court held an evidentiary hearing (Ex. H, pp. 124-158), and denied

relief as follows:

In the instant motion, Defendant claims one ground of ineffective
assistance of trial counsel.  As a general principle, to prevail on a claim
of ineffective assistance of counsel, a defendant must demonstrate that:
1) counsel's performance was deficient; and 2) there is reasonable
probability that the outcome of the proceeding would have been
different had counsel not been deficient.  See Torres-Arboleda v.
Dugger, 638 So. 2d 1321, 1324 (Fla. 1994) construing Strickland v.
Washington, 466 U.S. 668 (1984).  Moreover, a court considering a
claim of ineffective assistance of counsel need not determine whether
counsel's performance was deficient *when it is clear the alleged
deficiency was not prejudicial*.  See Torres-Arboleda, 636 So. 2d at 1324
(emphasis added).   Defendant bears the burden of showing that
counsel's errors were "so serious that counsel was not functioning as the
'counsel' guaranteed the defendant by the Sixth Amendment."
Strickland, 466 U.S. at 687.  There is a "wide range of professionally
competent assistance" that passes this constitutional muster.  Bertolotti
v. State, 534 So. 2d 386, 387 (Fla. 1988).  Furthermore, there is a
"strong presumption that counsel has rendered adequate assistance and
made all significant decisions in the exercise of *reasonable professional
judgment* with the burden on claimant to show otherwise."  Blanco v.
Wainwright, 507 So. 2d 1377, 1381 (Fla. 1987) (emphasis added).

Even if Defendant's counsel fell below such reasonable standards,
Defendant does not automatically prevail.  Defendant must also meet the
prejudice prong of the Strickland test.  For Defendant to prevail on this
prong, he or she must demonstrate that there is a "reasonable probability
that, but for the deficiency, the result of the proceeding would have been

different." <u>Spencer v. State</u>, 842 So. 2d 52, 61 (Fla. 2003). In other words, Defendant must demonstrate a "probability sufficient to undermine confidence in the outcome." <u>Id.</u>

In the instant motion, Defendant claims that trial counsel was deficient for failing to call Florida Department of Law Enforcement (FDLE) Agent Barry Hatton to testify at trial. Specifically, Defendant claims that Agent Hatton would have rebutted the testimony of the State's witness Susan Lusk, who testified that Defendant was manufacturing methamphetamine in a shed on her property.

. . . .

First, Agent Hatton was deposed about his involvement with this case and stated that he had not specifically worked on Defendant's case, but that he interviewed Jesse Lusk, who was Susan Lusk's husband, during an investigation of a stolen boat trailer. Agent Hatton further stated in the deposition that, "Jesse Lusk stated that the meth oil at his residence was his wife's, or for his wife." Agent Hatton then clarified, "He either said it was for his wife or – he indicated that it was for her, but he had knowledge that it was there." He also stated that he did not recall defendant's name coming up in the conversation with Mr. Lusk.

On April 26, 2007, the Court held an evidentiary hearing on the instant motion at which Defendant was present and represented by counsel. At the hearing, Agent Hatton testified that after having reviewed his reports, contrary to his recollection at his deposition, Defendant's name did not come up in his interview with Jesse Lusk, but only when Mr. Lusk stated that he had bought a shed from defendant. Agent Hatton also testified that Jesse Lusk had also told him that "the methamphetamine oil that was recovered at his residence at the time of the search warrant was either his wife's or for his wife, Susan Lusk." Agent Hatton was further questioned:

Q:  Would you have testified, had you been called at Mr. Burgess' trial, that the meth oil that was located at the residence was the meth oil that belonged to Susan Lusk?

A:  No, I would not.

Q:  Would you have testified, if you had been called at Mr. Burgess' trial, that Jesse Lusk told you that the meth oil that was found at the residence belonged to Susan Lusk?

A:  He said that it was either for her or that it was hers. That would have been my testimony.

Agent Hatton's testimony would not have been that "Mr. Lusk stated that the meth oil located inside of the meth lab belonged to Mrs. Lusk alone," as defendant states in the instant motion.  Defendant also alleges that trial counsel admitted his error during the trial in failing to subpoena Agent Hatton.  The trial transcript reflects that counsel mistakenly believed that the State was going to subpoena Agent Hatton, and therefore he failed to do so.  However, a review of the court file indicates that the State subpoenaed Agent Hatton originally to appear for trial on January 11, 2005.  This may have given trial counsel a reasonable basis to assume that the State would subpoena Agent Hatton again after the trial was continued, and represent to the jury in opening statement that he would be calling Agent Hatton to testify.  Additionally, the record reflects that defense counsel in fact subpoenaed Agent Hatton for trial on April 15, 2005.  It is not clear why Agent Hatton did not appear at trial, or why defense counsel did not recollect subpoenaing him.  Nevertheless, in order for Defendant to prove that counsel was deficient, he must demonstrate that counsel's errors were ***so serious as to deprive the defendant of a fair and reliable trial***.  This standard has been reiterated by Florida courts many times.  <u>See</u> <u>Mongo v. State</u>, 846 Fo. 2d 613, 614 (Fla. 1st DCA 2003) (citing e.g. <u>Thompson v. State</u>, 759 So. 2d 650 (Fla. 2000)).  The Court does not find that Defendant has met his burden as to the deficiency prong of the <u>Strickland</u> test.  <u>See also</u> <u>Maxwell v. Wainwright</u>, 490 so. 2d 927, 932 (Fla. 1986) (acts worthy of

postconviction relief must be "outside the broad range of reasonably competent performance under prevailing professional standards.")

Moreover, in the State's response to the Court's Order to Show Cause, and at the evidentiary hearing on this matter, the State argued that even if Agent Hatton had been called to testify, the testimony in question would have been inadmissible as hearsay. While it appears that the State is correct in its contention, and it is not likely that the testimony would have been admissible at trial, the Court finds that even if it had been admitted at trial, it would not have made a difference in the outcome of the proceedings, and accordingly, Defendant has also failed to meet his burden to prove that he was prejudiced by counsel's inaction.

First, if Jesse Lusk's statement was that the meth oil was *for her*, (his wife, Susan Lusk,) it would not have contradicted the State's evidence at trial. Susan Lusk testified that she was a meth user and that Defendant supplied her with the drug, which he was manufacturing in a shed on their property. She also testified that she purchased items to give Defendant to make the drug in exchange for the finished product. Therefore, even the statement that it was "hers," does not prove that Defendant was not manufacturing it.

In addition to the testimony of Susan Lusk, other witnesses testified at trial that Defendant had supplied them with meth and used meth in their presence. James Lusk, Jesse Lusk's father, testified that he had seen Defendant in the shed, and knew him to have a key to the shed, which was found to be an active meth lab. Additionally, when a search warrant of Defendant's residence was executed, after Jesse and Susan Lusk had been arrested for the meth lab found on their property, evidence of a dismantled meth lab was seized at Defendant's home.

At trial, the defense argued that the testimony of Susan Lusk was tainted by bias, which is what Defendant contends in the instant motion that the testimony of Agent Hatton would have suggested. The defense also argued that no evidence was recovered that directly linked

Defendant to the meth lab operation.  However, the jury apparently disagreed.

Because Defendant has not proven either the deficiency of trial counsel, or that he was prejudiced by counsel's inactions, his claim of ineffective assistance of counsel fails.

(Ex. H, pp. 279-284) (footnotes omitted).  The First DCA summarily affirmed.

All of the state court's factual findings are supported by the state court record. Petitioner has not presented clear and convincing evidence that any factual finding is incorrect, nor has he shown that any factual determination is unreasonable.  Thus, § 2254(d)(2) provides no basis for federal habeas relief.  With regard to the first element of § 2254(d)(1), the state court's decision was not contrary to clearly established federal law, because the state court utilized the *Strickland* standard.  The only remaining question is whether the state court's application of *Strickland* was objectively unreasonable.

Petitioner's counseled habeas petition argues that the state court's rejection of his claim was unreasonable, because:  (1) the state court did not "negate the Defendant's ultimate assertion . . . that trial counsel's failure to subpoena Agent Hatton left Susan Lusk's testimony unchallenged" (doc. 5, pp. 6-7); and (2) counsel's failure to call Hatton deprived petitioner of showing that petitioner's name was never mentioned during Hatton's investigation of the case (doc. 5, pp. 6-8).  The court will address each of these arguments in turn, but will first address an issue that appears dispositive of the case.

One of the state court's bases for denying relief was that petitioner failed to show he was prejudiced by counsel's failure to subpoena/call Hatton to testify, because it was unlikely Hatton's testimony would have been admissible under state

evidentiary law.  Petitioner's counseled petition does not challenge the state court's conclusion that Hatton's testimony would likely have been excluded under state law. Even if petitioner did challenge this conclusion, this court is required to defer to the state court's resolution of this state law issue.[4]

---

[4]In the state postconviction proceeding, the State argued that Hatton's testimony was inadmissible hearsay and would have been excluded under state evidentiary law.  (Ex. H, pp. 30-31, 148-150).  The State asserted that the defense's intent in calling Hatton (which was apparent in defense counsel's opening argument) was for Hatton to testify about the out-of-court statement of Jesse Lusk  to prove the truth of what Jesse Lusk stated – that the meth oil in the shed belonged to Susan Lusk.  The State also argued that Hatton's proposed testimony did not qualify as admissible impeachment evidence under Florida law, because the statement did not fall within any of the provisions of Fla. Stat. § 90.608.  For example, Hatton's testimony did not relate a prior statement of Susan Lusk (the witness the defense was intending to impeach), but a prior statement of Jesse Lusk. (Ex. H, pp. 148-49) (*citing Williams v. State*, 510 So.2d 656 (Fla. 2d DCA 1987) (holding that testimony of defendant's foster daughter regarding her conversation with defendant's father-in-law in which father-in-law told foster daughter that defendant and his sister-in-law once had an affair was inadmissible hearsay).

Petitioner's postconviction counsel argued that Agent Hatton's testimony was admissible impeachment evidence – because Lusk's out-of-court statement to Hatton was "inconsistent" with Susan Lusk's testimony at trial and showed Susan Lusk's motivation to testify falsely against petitioner.  (Ex. H, pp. 36-37, 141-45).  Postconviction counsel also argued that "[w]henever you have statements that are material to a defendant's theory of defense, even hearsay statements could potentially admissible if they're [sic] reliability is such that it protects the Court from danger of hearsay."  (Ex. H, pp. 141-45).  Petitioner presented the state court with state law cases which petitioner contended supported his position that Hatton's testimony was admissible as impeachment: *McCray v. State*, 919 So. 2d 647 (Fla. 1st DCA 2006) (holding that police officer's testimony concerning the description the victim's mother gave to him of petitioner was not hearsay under Fla. Stat. § 90.801(1)(c), because it was used to impeach the mother's trial testimony rather than to prove the content of the mother's description); *Freeman v. State*, 858 So. 2d 319 (Fla. 2003) (holding that trial counsel's failure to subpoena a witness (who failed to appear at sentencing) was partly a tactical decision to prevent the State from knowing who the defense witnesses were); *Morrison v. State*, 818 So. 2d 432 (Fla. 2002) (interpreting Fla. Stat. §§ 90.608(2) and 90.801(1)(c), and holding that the defendant could attempt to attack a State witness' credibility by asking the witness if a detective had told her she herself was a suspect in the crime).  (Ex. H, pp. 75-123).  Postconviction counsel's written closing argument also cited to Fla. Stat. 90.608(1), which provides that a party may attack the credibility of a witness by "[i]ntroducing statements of the witness which are inconsistent with the witnesses's present testimony."  (Ex. H, p. 260, n.2) (emphasis added).

"[A] state court's interpretation of state law . . . binds a federal court sitting in habeas corpus." *Bradshaw v. Richey*, 546 U.S. 74, 76, 126 S. Ct. 602, 163 L. Ed. 2d 407 (2005); *see also Mullaney v. Wilbur*, 421 U.S. 684, 691, 95 S.Ct. 1881, 44 L. Ed. 2d 508 (1975) ("State courts are the ultimate expositors of state law," and federal courts must abide by their rulings on matters of state law) (citations and footnote omitted); *Carrizales v. Wainwright*, 699 F.2d 1053, 1055 (11th Cir. 1983). Although an ineffective assistance of counsel claim is a federal constitutional claim which the court considers in light of the clearly established law of *Strickland*, when "the validity of the claim that [counsel] failed to assert is clearly a question of state law, . . . we must defer to the state's construction of its own law." *Alvord v. Wainwright*, 725 F.2d 1282, 1291 (11th Cir. 1984) (explaining, in the context of an ineffective assistance of appellate counsel claim, that "[o]n the one hand, the issue of ineffective assistance – even when based on the failure of counsel to raise a state law claim – is one of constitutional dimension," but, "[o]n the other hand, the validity of the claim [counsel] failed to assert is clearly a question of state law, and we must defer to the state's construction of its own law.") (citations omitted);[5] *see also Callahan v. Campbell*, 427 F.3d 897, 932 (11th Cir. 2005) (holding that defense counsel cannot be deemed ineffective for failing to make a state-law-based objection when the state court has already concluded that the objection would have been overruled under state law; to conclude otherwise would require the federal habeas court to make a determination that the state court misinterpreted state law, which would violate the fundamental principle that federal habeas courts should not second-guess state courts

---

[5]*Alvord* was superseded by statute on other grounds as noted in *Hargrove v. Solomon*, 227 F. App'x 806 (11th Cir. 2007).

on matters of state law); *Herring v. Sec'y, Dep't of Corr.*, 397 F.3d 1338, 1354-55 (11th Cir. 2005) (denying federal habeas relief on ineffective assistance claim based on counsel's failure to make state-law-based objection; holding that the Florida Supreme Court's conclusion that the proposed objection would have been overruled was binding and precluded federal habeas relief on the ineffective assistance claim: "The Florida Supreme Court already has told us how the issues would have been resolved under Florida state law had [petitioner's counsel] done what [petitioner] argues he should have done. . . . It is a 'fundamental principle that state courts are the final arbiters of state law, and federal habeas courts should not second-guess them on such matters.'") (alterations in original) (*quoting Agan v. Vaughn*, 119 F.3d 1538, 1549 (11th Cir.1997)).

Here, as in *Alvord*, *Callahan*, and *Herring*, the state court has already answered the question of what would have happened had defense counsel sought to introduce Agent Hatton's proposed testimony – the prosecutor would have objected on hearsay grounds (as the prosecutor did when counsel referenced Hatton's proposed testimony in opening statement) and the objection would have been sustained. The state court's conclusion that Hatton's proposed testimony likely would have been excluded shows that counsel's failure to subpoena/call Hatton caused no prejudice. The state court's rejection of petitioner's ineffective assistance claim on this basis was a reasonable application of *Strickland* and provides a sufficient basis to deny federal habeas relief without reaching petitioner's additional arguments. The court will nonetheless address the merits of the arguments raised in petitioner's amended petition, for purposes of completeness.

Petitioner first argues that the state court's denial of relief was unreasonable, because the court's analysis "does not negate the Defendant's ultimate assertion . . . that trial counsel's failure to subpoena Agent Hatton left Susan Lusk's testimony unchallenged." (Doc. 5, pp. 6-7). Petitioner asserts that "proof of guilt to the exclusion of a reasonable doubt went unchecked by trial counsel's failure to subpoena Agent Hatton"; and that "Agent Hatton's expected testimony would have indeed supported the Defendant's theory of defense" (doc. 5, p. 7), by "supplying reasonable doubt as to the prosecution's accusations against the Defendant" (doc. 5, p. 5). To the extent petitioner suggests defense counsel could have used Hatton's testimony concerning Jesse Lusk's out-of-court statement as substantive exculpatory evidence that the meth oil seized from the shed was Susan Lusk's and not petitioner's, petitioner's argument fails because the state court concluded Hatton's testimony would have been excluded as inadmissible hearsay under state evidentiary law if submitted for that purpose.

Petitioner's next argument is that the state court's denial of relief was unreasonable, because petitioner demonstrated Hatton's testimony "would have negated the veracity of Susan Lusk's testimony in two respects," namely, by showing Susan Lusk "had a reason to be less than truthful in that Lusk was offered a favorable plea agreement for testimony against the Defendant;" and by showing that Lusk "was being less than truthful as Susan Lusk's husband Jess[e] Lusk had only implicated his own wife as being in possession of the manufacturing substances." (Doc. 5, p. 8).

The record conclusively refutes petitioner's contention that Hatton's testimony would have shown that Susan Lusk was offered a favorable plea agreement for testimony against petitioner. Neither Hatton's pre-trial deposition testimony, nor Hatton's postconviction evidentiary hearing testimony made mention of Susan Lusk

being offered a plea agreement.  (Ex. H, pp. 130-38).  In fact, there is no evidence in the record that at the time of petitioner's trial, Susan Lusk had been offered a favorable plea agreement for testimony against petitioner.  To the contrary, the trial transcript establishes that at the time Susan Lusk testified, she had not been offered a plea agreement but was merely hoping her attorney was making an effort to negotiate one.  (Ex. B, pp. 196-98).  In any event, evidence of Susan Lusk's motive to lie was elicited from Susan Lusk herself during defense counsel's aggressive cross-examination of her.  Defense counsel had Susan Lusk admit that:  (1) deputies found methamphetamine and drug paraphernalia inside her dresser drawer when they executed the search warrant at the Lusk's property, (2) Lusk had been using meth for eight months before she was arrested, (3) Lusk was presently under indictment for trafficking in over 200 grams of methamphetamine, unlawful possession of listed chemicals, and possession of drug paraphernalia, (4) Lusk's husband Jesse Lusk had been convicted of the same crimes and was sentenced to fifteen years in prison on the trafficking charge and to five years in prison on the remaining charges and (5) Lusk was hoping her attorney was attempting to negotiate a plea agreement with the prosecutor.  (Ex. B, pp. 195-198).   During closing argument, defense counsel emphasized Susan Lusk's bias and motive to lie, telling the jury that "Susan Lusk has told you a story, a story just to assist her in her plea negotiations."  (Ex. B, pp. 287-88).  Defense counsel also emphasized to the jury evidence (a deputy's testimony) that when Susan Lusk was arrested, she lied to deputies by denying use of methamphetamine, because she was afraid.  Defense counsel argued that Susan Lusk was even more afraid now that criminal charges were pending against her and her husband had been convicted and sentenced to prison, and that her fear of being sent to prison was motivating her to lie about petitioner's involvement so she could garner

favor with the prosecutor.   (*Id.*).   Hatton's testimony would not have shown that Susan Lusk "had a reason to be less than truthful in that Lusk was offered a favorable plea agreement for testimony against the Defendant."  (*See* Doc. 5, p. 8).

The record also refutes petitioner's contention that Hatton's testimony would have impeached Susan Lusk's credibility by showing that Jesse Lusk implicated only Susan as possessing the manufacturing substances and did not implicate petitioner. (Doc. 5, pp. 7-8).  The evidence at the postconviction evidentiary hearing establishes that had defense counsel called Hatton and questioned him about the fact that petitioner's name did not come up during Hatton's interview of Jesse Lusk after Jesse mentioned the meth oil belonged to Susan Lusk, Hatton would have explained that there was no reason petitioner's name <u>would have</u> come up:

> Q [Petitioner's postconviction counsel]:  During that interview with Mr. Lusk, did he make any statements to you regarding the defendant, Christopher Burgess?
>
> A [Agent Hatton]:  I had conducted an interview with Lusk following his arrest for methamphetamine violations.  But, again, it was for the theft of property case that I was involved in at the time.  The only reference he made to Chris Burgess at the time was regarding a shed or out building that he said he had purchased from Burgess.
>
> Q:  And do you recall when he made those statements to you?
>
> A:  It was in September of '03, if I'm not mistaken.  Maybe September 17th.
>
> Q:  Did you have more than one interview with Mr. Lusk?
>
> A:  No, sir, I did not.
>
> . . . .

Q:  At any point in time, did Mr. Jesse Lusk make a statement about Susan Lusk?

A:  He did.

Q:  And do you recall what those statements were?

A:  It was something to the effect that the methamphetamine oil that was recovered at his residence at the time of the search warrant was either his wife's or for his wife, Susan Lusk.

Q: Okay.  And as a result of that information, did you investigate Susan Lusk's involvement in this case as it relates to the methamphetamine?

A:  Like I said, Lusk was a subject of a theft investigation and the target of a methamphetamine investigation.  The interview that he told me that was regarding the theft case and that's what we were there to talk about. Once the information was given about Susan, and I wasn't present for Defendant Burgess' arrest or Jesse Lusk's arrest, I provided the information to Walton County Narcotics and continued on with my investigation on the theft.

(Ex. H, pp. 131-134).  On cross examination, Hatton testified:

Q [The State]:  Agent Hatton, the interview that you were conducting on September 17, 2003, the nature of that interview was for theft; is that correct?

A [Agent Hatton]:   That's correct.

Q:   So you really weren't there investigating whether or not methamphetamine was being produced or had been produced at the location where Jesse Lusk was arrested?

A:  No, I wasn't.

Q:  So there wasn't a lot of questions asked about whose meth was whose and where it was made and who made it?

A:  There was no questions asked.  That was just a spontaneous statement that he made once we got started with the interview.

Q:  So in other words, you didn't go into any further detail of how the meth got there.  And your answer was it was for Susan Lusk, right?

A:  Correct.

Q:  So you didn't go into who made it for Susan Lusk?

A:  That's correct.

Q:  And you didn't go into who was providing it to Susan Lusk?

A:  That's correct.

(Ex. H, p. 136).

The state court's conclusion – that had Hatton testified it would have added little, if anything, to the defense's impeachment of Susan Lusk's credibility – was a reasonable application of *Strickland*'s prejudice prong.

All in all, this court cannot say that no fairminded jurist could agree with the state court's determination that Hatton's proposed testimony would not have made a difference in the outcome of petitioner's trial.  The trial transcript demonstrates that Jesse Lusk's purported statement was not inconsistent with Susan Lusk's testimony that petitioner manufactured methamphetamine in the shed for her and Jesse's consumption.  In addition, several other witnesses corroborated Susan Lusk's testimony and implicated petitioner in the trafficking of methamphetamine and ancillary crimes.

Marvin Williford, an investigator in the narcotics division of the Walton County Sheriff's Office, testified that on August 27, 2003, a search warrant was

executed on the property of Jesse Lusk and Susan Lusk.  (Ex. B, pp. 45-46).  On Jesse and Susan Lusk's property was a mobile home, a storage shed and a prefabricated metal shed.  (*Id*., p. 47).  The prefabricated shed housed what appeared to be an operational methamphetamine lab.  (*Id*., p. 48).  The shed consisted of numerous precursor chemicals for making methamphetamine.  (*Id*., pp. 48-50).  Williford testified to several items seized from the shed including paraphernalia and other listed precursor chemicals for methamphetamine.  (*Id*., pp. 50-64).

Caleb Davidson, a former deputy with the narcotics division of the Walton County Sheriff's Office, testified that he was present when the search warrant was executed on the Lusk's property.  (*Id*., p. 95).  Sergeant Davidson was the primary investigator who searched the shed where the methamphetamine lab was located.  (*Id*.).  Davidson testified that petitioner's vehicle was recognized and located next to the shed.  (*Id*., p. 105).  Davidson testified that two weeks after the search warrant was executed on the Lusk's property, Davidson served a search warrant on petitioner's home on September 16, 2003.  (*Id*., p. 111).  Davidson found chemicals necessary to make methamphetamine, numerous Pyrex dishes with markings (razor blade scrapings) consistent with scraping  methamphetamine, containers with bi-layered liquid and drug paraphernalia.  (*Id*., pp. 115-117).  The items looked like a disassembled methamphetamine lab.  (*Id*., p. 117).

Bruce Maddox, a former deputy with the narcotics division of the Walton County Sheriff's Office, testified that he was involved with the search and seizure that occurred at the Lusk's property, but did not search the main house.  (*Id*., p. 134).  Maddox's primary objective was to maintain the evidence log during the seizure.  (*Id*.).  Maddox testified that petitioner's name appeared in several areas of the field operation plan.  (*Id*., p. 136).  The field operation plan was essentially an overview

of the premises to be searched and the underlying circumstances regarding the search. (*Id.*, pp. 137-38).

Lauri Dean testified that she lived with her husband in a trailer which sat on property owned by Gary and Angela Burgess. (*Id.*, pp. 141-42). Dean had a portable building or storage shed on the property. (*Id.*, p. 142). Between April 1, 2003, and April 15, 2003, the portable shed disappeared from the property. (*Id.*, p. 143). The shed was later recovered by the Walton County Sheriff's Department. (*Id.*, p. 141).

James Lusk testified that he was the father of Jesse Lusk, who lived with his wife Susan on James Lusk's property that was the subject of law enforcement's search and seizure. (Ex. B, p. 145). James Lusk testified that the shed or portable building that was found on his property during the August 27, 2003 search was not his shed. (*Id.*). Prior to the execution of the search warrant at his property, Mr. Lusk saw petitioner and petitioner's brother Gary at Jesse Lusk's house. After Mr. Lusk's property had been searched, and after his son Jesse and Jesse's wife Susan had been arrested, Mr. Lusk again saw petitioner on the same property moving items out of the shed. (*Id.*, p. 148). Mr. Lusk also saw petitioner removing glassware from Jesse and Susan's residence.

Joni Burgess testified that she married petitioner on the Sunday prior to the beginning of petitioner's trial. (Ex. B, p. 169). Mrs. Burgess admitted to using methamphetamine with petitioner, and acknowledged receiving methamphetamine from petitioner. (*Id.*, pp. 169-170).

Susan Lusk testified that she was married to Jesse Lusk. (Ex. B, p. 172). During the middle part of 2002, Susan Lusk and her husband separated for a brief time, and Jesse moved in with his friend Carmen Adams. (*Id.*, p. 173). Susan Lusk and her husband began reconciling around November of 2002. (*Id.*, p. 173). Susan

Lusk admitted that during her reconciliation with Jesse she learned that Jesse had begun smoking methamphetamine. (*Id*., p. 174).  Susan Lusk visited the home of Carmen Adams and learned that Jesse Lusk received methamphetamine from petitioner. (*Id*.).  Susan Lusk admitted to using methamphetamine herself, and to receiving the drug from petitioner. (*Id*., p. 175).    Susan Lusk smoked methamphetamine with her husband and petitioner on several occasions. (*Id*., pp. 175-76).  At first, Susan Lusk and her husband smoked methamphetamine only on the weekend. (*Id*., p. 176).  After a few months of this recreational usage, in April of 2003, petitioner moved a shed onto the Lusk's property and began manufacturing methamphetamine in the shed. (*Id*., p. 177).  Susan Lusk testified that Jesse and petitioner told her that the previous owners of the shed were renting from petitioner's brother Gary, and gave them the shed because they (the previous owners) were behind on their rent. (*Id*., p. 178).  Susan Lusk testified that the shed was locked and that both her husband and petitioner had keys to the shed where the methamphetamine was being manufactured. (*Id*., p. 179).  After petitioner brought the shed to the Lusk's property, the Lusks did not have to purchase methamphetamine anymore, but instead purchased the precursor materials needed to manufacture methamphetamine and gave them to petitioner who, in return, manufactured the methamphetamine and gave it to the Lusks for free. (*Id*., pp. 179-180).  Petitioner told the Lusks what supplies to purchase, and they purchased them. (*Id*.).  Susan Lusk testified that she saw Jesse Lusk in the shed when petitioner was manufacturing methamphetamine. (*Id*., p. 180).  Petitioner manufactured methamphetamine about once per week. (*Id*.). Susan Luck testified that the goblin depicted in one of the pictures of the shed taken during execution of the search warrant was drawn by another individual named Chip

Robinson, but petitioner had painted on it.  (*Id*., pp. 184-85).  Susan Lusk stated that the goblin was designed to stand for methamphetamine.  (*Id*., p. 185).

Carmen Adams testified that he knew petitioner on a personal level.  (Ex. B, p. 211).  Adams testified that Jesse Lusk moved in with him (Adams) in early 2002 after separating from his wife, and that Lusk reconciled with his wife in approximately November of 2002.  (*Id*., pp. 214-15).  During the time Lusk resided with Adams, petitioner frequently visited Adams' residence, brought methamphetamine with him, and the three smoked it.  (*Id*., p. 213).  This continued during the period the Lusks were reconciling, and Susan Lusk began using methamphetamine as well.  (*Id*., p. 214).  Jesse Lusk eventually moved out of Adams' residence and moved back in with his wife.  (*Id*., pp. 214-15).  After Lusk moved out, Adams visited Lusk at his home.  (*Id*., p. 215).  Adams observed a shed on Lusk's property, and observed petitioner and Jesse Lusk go into the shed.  (*Id*., p. 215).  The shed was locked.  (*Id*., p. 215).  Adams did not see anyone but petitioner and Jesse Lusk go into the shed.  (*Id*., p. 216).  Adams smelled an odd odor coming from the shed.  (*Id*., p. 216).  There is a strong smell associated with the production of methamphetamine.  (*Id*., p. 67).  Adams testified that at one point petitioner asked him if he (petitioner) could borrow a flat bed trailer.  (*Id*., p. 218).  The trailer was big enough to transport a shed.  (*Id*.).  Adams testified that he received methamphetamine from petitioner during "the whole period" from when Jesse Lusk moved in with him (Adams), during Lusk's residence with him, and after Lusk moved out.  (*Id*., pp. 214, 219).  Petitioner asked Adams to purchase matches and other products for petitioner to make methamphetamine, but Adams declined.  (*Id*., p. 217).  The striker plates off of matchbooks are used in methamphetamine production.  (*Id*., p. 54).

Teresa Pribbenow testified that she was employed with the Florida Department of Law Enforcement in Pensacola, Florida in the crime laboratory unit. (Ex. B, p. 233). Pribbenow was a forensic drug chemist. (*Id*.). Pribbenow tested some of the contents that were seized from the shed on the Lusk's property. (*Id*., pp. 237-39; *see also* Williford's testimony at Ex. B, pp. 45-55). The total weight of the methamphetamine in the shed was 609.6 grams. (*Id*.).

The foregoing demonstrates that had Hatton testified to Jesse Lusk's statement, there is no reasonable probability the outcome of petitioner's trial would have been different. The state court reasonably concluded that neither counsel's failure to call Hatton, nor counsel's reference to Hatton in opening statement, undermines confidence in the jury's verdict.

The state court's rejection of petitioner's claim was not contrary to *Strickland*, did not involve an unreasonable application of *Strickland*, and was not based on an unreasonable determination of the facts. Petitioner is not entitled to federal habeas relief.

## CERTIFICATE OF APPEALABILITY

Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts provides: "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." If a certificate is issued, "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)." A timely notice of appeal must still be filed, even if the court issues a certificate of appealability. Rule 11(b), Rules Governing Section 2254 Cases.

The petitioner in this case fails to make a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473,

483-84, 120 S. Ct. 1595, 1603-04, 146 L. Ed. 2d 542 (2000) (explaining the meaning of this term) (citation omitted).  Accordingly, the court should deny a certificate of appealability in its final order.

The second sentence of Rule 11(a) provides:  "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue."  Rule 11(a), Rules Governing Section 2254 Cases.  If there is an objection to this recommendation by either party, that party may bring such argument to the attention of the district judge in the objections permitted to this report and recommendation.

Accordingly, it is respectfully RECOMMENDED:

1.  That the amended petition for writ of habeas corpus (doc. 5), challenging the judgment of conviction and sentence in *State of Florida v. Christopher Grey Burgess*, Walton County, Florida, Circuit Court Case Number 04-664, be DENIED, and the clerk be directed to close the file.

2.  That a certificate of appealability be DENIED.

At Pensacola, Florida this 12th day of August, 2014.

/s/ *Charles J. Kahn, Jr.*

**CHARLES J. KAHN, JR.**
**UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

Any objections to these proposed findings and recommendations must be filed within fourteen days after being served a copy hereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u>  A copy of any objections shall be served upon any other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; *United States v. Roberts*, 858 F.2d 698, 701 (11th Cir. 1988).